UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

United States of America

v.

Raymond Otto Tarbell

Crim. No. 2:23–mj–139–1

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Raymond Otto Tarbell is a logger who owns land neighboring on the Green Mountain National Forest in Stratton, Vermont. It is undisputed that in or about 2021, Mr. Tarbell harvested approximately 300 trees. The government asserts the harvest was unlawful because it was undertaken without authorization on the Green Mountain National Forest. Mr. Tarbell takes the position that he did nothing unlawful because the trees were on his own land. The government further alleges that, in the months after the timber harvest, Mr. Tarbell defaced or removed a monument or bench mark of a government survey in an apparent effort to assert his disagreement with the government's claim of ownership. The matter resulted in a criminal prosecution.

By Amended Information filed on April 24, 2025, the United States charged Mr. Tarbell as follows:

### Count 1

Between in or about December 2020, and in or about March 2021, in the District of Vermont, the defendant RAYMOND TARBELL, cut, removed, and damaged trees, timber, and forest products in the Green Mountain National Forest.

(36 C.F.R. § 261.6(a); 16 U.S.C. § 551; 18 U.S.C. § 2)

<u>Count 2</u>

Between in or about June 29, 2021, and on or about September 15, 2021, in the District of Vermont, the defendant RAYMOND TARBELL, willfully defaced, changed, and removed, a monument or bench mark of a Government survey.

(18 U.S.C. § 1858; 18 U.S.C. § 2)

<u>Count 3</u>

Between on or about September 15, 2021, and on or about September 16, 2021, in the District of Vermont, the defendant RAYMOND TARBELL, willfully defaced, changed, and removed, a monument or bench mark of a Government survey.

(18 U.S.C. § 1858; 18 U.S.C. § 2)

The Court conducted a bench trial on May 20, 21, and 22, 2025. The government called twelve witnesses at trial: retired U.S. Forest Service Surveyor George Butts; retired U.S. Forest Service Survey Technician Greg Schutt; retired U.S. Forest Service Land Surveyor Nancy Iwanicki; retired Forestry Technician Frank Thompson; U.S. Forest Service Recreation Technician Raymond Finan; U.S. Forest Service Timber Management Specialist Stacy Stratton; Forestry Technician Jonathan Fuller; U.S. Forest Service Surveyor Stephen Grimaldi; U.S. Forest Service Special Agent Charles Brooks; U.S. Forest Service Geographic Information Specialist Joy Phelan; Stratton Town Clerk Kent Young; and Stratton 911 Coordinator Candice Bernard. Mr. Tarbell called three witnesses at trial: David Van Vleck, Jr., whose family owned the property for over thirty years before selling to Mr. Tarbell; retired Stratton Road Foreman Ralph Staib; and Land Surveyor Joseph DiBernardo.

The government and Mr. Tarbell filed post-trial memoranda with proposed findings of fact and conclusions of law and the matter was taken under advisement. Based on the Findings of Fact

2

and Conclusions of Law set forth below, the Court finds Raymond Otto Tarbell NOT GUILTY of

Counts 1, 2, and 3 of the Amended Information.

### Jurisdiction

"Subject-matter jurisdiction presents a threshold question in any federal prosecution."

*United States v. Baucum*, 80 F.3d 539, 540 (D.C. Cir. 1996) (per curiam). Federal courts are courts

of limited jurisdiction, and "have only the power to hear those cases over which Congress has

conferred subject-matter jurisdiction upon them." *Id.* Even in the absence of an objection to the

exercise of jurisdiction, federal courts must examine their "own subject-matter jurisdiction in

criminal cases as well as civil cases." *In re Sealed Case*, 131 F.3d 208, 210 (D.C. Cir. 1997).

Under 18 U.S.C. § 3231, district courts "have original jurisdiction . . . of all offenses against

the laws of the United States." "If an indictment or information alleges the violation of a crime set

out in Title 18 or in one of the other statutes defining federal crimes, that is the end of the

jurisdictional inquiry." *United States v. Fahnbulleh*, 752 F.3d 470, 476 (D.C. Cir. 2014) (citation

modified) (quoting *United States v. George*, 676 F.3d 249, 259 (1st Cir. 2012)).

The Amended Information clearly alleges crimes arising under federal law. Central to

Mr. Tarbell's defense, however, is the claim that the government cannot prove beyond a reasonable

doubt that the site of the charged unlawful activities was on U.S. Forest Service land, a claim that at

least potentially affects subject matter jurisdiction. The Court finds that this dispute does not

"impugn the district court's subject matter jurisdiction" because such a challenge necessarily "rests

on evidentiary proof at trial." *Id.* "It sounds in the nature of a claim that the evidence was

insufficient" for the charged counts. *Id.* (citation modified). Therefore, the Court may exercise

subject matter jurisdiction over this case.

### Findings of Fact[1]

The National Forest System includes the Green Mountain National Forest. (Doc. 60 at 39:1–7.) A parcel of land designated as "Tract 435" lies within the confines of the Green Mountain National Forest. (*Id.*) Mr. Tarbell owns two parcels of real property adjacent to Tract 435—Lot 3, Ranges 8 and 9.

In October 1985, Greg Schutt, a land survey technician for the Forest Service, conducted field work for a survey of Tract 435. (Exs. 5, 7.) Mr. Schutt identified several points that he believed marked the east-west boundary between Tract 435 and Mr. Tarbell's property to the south—among others, those referred to as Corners 16, 17, and 18. (*Id.*) At Corners 16 and 18, Mr. Schutt placed Forest Service monuments to perpetuate the corners—concrete-filled iron pipes with brass caps stamped with identifying information. (*Id.*) Mr. Schutt piled stones at the bases of the iron pipes. (*Id.*) He also identified a point in the centerline of the east branch of the Deerfield River as Corner 17. (*Id.*) Mr. Schutt returned to Tract 435 in June 1986 and set a Witness Corner for Corner 17—a concrete-filled iron pipe with stones piled at the base and a stamped brass cap identifying the location of the corner in the river. (*Id.*) Mr. Schutt also set several other boundary markers at these corners, including bearing trees and signs. (*Id.*)

In April 1995, Green Mountain National Forest staff conducted maintenance of Corner 16. (Ex. 6 at 4292.05.) They located the bearing trees, sign, and iron pipe Mr. Schutt had set in October 1985. (*Id.*)

In June 2021, several individuals employed by the Green Mountain National Forest observed that a timber harvest had occurred in the vicinity of Tract 435. On June 5, 2021, Forest

---

[1] These findings of fact reflect the Court's assessment of the demeanor and reliability of the witnesses and the reasonable inferences drawn from the testimony found to be credible and persuasive. The Court includes transcript citations for many of the facts found, but these citations are not intended to be exclusive. The Court also drew important inferences from a multitude of circumstantial facts; it would be impractical to list all circumstances supporting each such inference.

Service Technician Raymond Finan observed evidence of a private logging operation and two trails blocked by fallen trees on what he believed was Forest Service land. (Doc. 60 at 145:1–147:11; *see also* Ex. 9 (photographs of cut and fallen trees).) The logging "appeared to be relatively recent because there was very little new growth, understory growth. The wood appeared to be fairly freshly cut when you looked at the end of the logs." (Doc. 60 at 149:9–14.)

Finan found no indication that any logs had been removed from the area through the Forest Service trail. (*Id.* at 150:8–21.) But he noted there was an access point to the Grout Pond Access Road located on the adjacent private property—Mr. Tarbell's property. (*Id.* at 150:22–151:4; 146:16–20.) Finan also observed logging equipment on Mr. Tarbell's property near the access point. (*Id.* at 146:5–20.) Mr. Tarbell cuts trees for a living. (Ex. 17(d) at 0:04–0:07.) Finan also observed a sign with the words "POSTED Private Property" near one of the trail blockages. (Doc. 60 at 148:11–21; Ex. 9.) The bottom of the sign displayed "R. Otto Tarbell" and "Jan. 11 2021" in handwritten text. (Ex. 9.)

Stacy Stratton, a timber management specialist for the United States Forest Service, also observed a recent timber harvest and trail blockages in the same area on June 23, 2021. (Doc. 60 at 164:10–12; Exs. 10, 11.) In addition to a harvest area "approximately two acres in size," Mr. Stratton saw "what [he] would call slash . . . the tops of trees or brush, that's been piled up blocking the trail and blocking anyone from moving south" along Forest Trail 383. (*Id.* at 165:5–23; 166:2–11.) Mr. Stratton testified extensively regarding the methodology he used to evaluate the harvest site and the remaining stumps and concluded that 299 merchantable trees had been harvested with a volume of approximately 4600 cubic feet. (*Id.* at 170:21–179:9.) After observing the lack of soil rutting, little tree regeneration, and very little grass growing in the area, Mr. Stratton concluded that the harvest had taken place recently—"probably a winter harvest." (*Id.* at 166:11–

19.) Mr. Stratton saw no indication that the timber had been removed via the Forest Service trail. (*Id.* at 166:20–23.)

In June 2021, Forest Service Surveyor Stephen Grimaldi conducted a land boundary verification of Corners 15, 16, and 17 on the line between Tract 435 and Mr. Tarbell's property. (*Id.* at 189:14–15; Doc. 61 at 18:15–22.) Mr. Grimaldi attempted to locate the iron monument and bearing trees at Corner 16, but he was unable to do so. (Doc. 60 at 193:3–24.) At Corner 17, Mr. Grimaldi found the bearing tree and Witness Corner and observed cut stumps with blaze paint on them consistent with the paint that the Forest Service uses to mark bearing trees. (*Id.* at 189:11–190:24.) Mr. Grimaldi also walked the "blaze line" of trees between Corners 16 and 17 and observed that someone had attempted to remove the blaze paint from the trees. (*Id.* at 190:25–191:16.)

In September 2021, Mr. Grimaldi returned to Tract 435 to remonument Corner 16. (*Id.* at 201:23—202:2-7.) Mr. Grimaldi installed a drive rod into the remaining mound of stone with an aluminum cap with identifying information on it. (*Id.* at 202:9–13.) He also returned to Witness Corner 17 and discovered that the monument had been "pulled straight out of the ground" and that the stump's "Bearing Tree" tag he had placed in June had been mostly removed. (*Id.* at 203:3–25.) When Mr. Grimaldi walked the blaze line between Corners 16 and 17, he noticed "that all the flagging that [he] had put up before was ripped down." (*Id.* at 204:1–9.) The following day, Mr. Grimaldi came back to Tract 435 and discovered that the monument he had set at Corner 16 the previous day had been removed. (*Id.* at 204:11–21.)

## Conclusions of Law

I.    **Count I: Cutting Any Timber, Tree, Or Forest Product in the National Forest System**

Federal regulations prohibit "[c]utting or otherwise damaging any timber, tree, or other forest product, except as authorized by a special-use authorization, timber sale contract, or Federal

6

law or regulation" in the National Forest System or on a national forest system road or trail. 36 C.F.R. § 261.6(a) (citation modified); *id.* § 261.1(a).

### A. Whether Mr. Tarbell Cut or Otherwise Damaged Any Timber, Tree, or Other Forest Product

The Government has met its burden of showing that Mr. Tarbell cut or otherwise damaged the timber and trees at issue during the period from December 2020 to in or about March 2021.

In addition to the evidence discussed in the findings of fact above, Mr. Grimaldi testified that he and Agent Colin Fisher—a law enforcement officer for the Forest Service at the time— encountered Mr. Tarbell in the area of the timber harvest on June 29, 2021. (Doc. 60. at 199:11–24.) Agent Fisher asked Mr. Tarbell, "Did you cut this timber?" (*Id.* at 200:12–201:1.) Mr. Tarbell responded, "Yes, I did. It's my land. I'll see you in court." (*Id.* at 201:2–9.)

Based on the witness testimony and the photographic and video evidence discussed above, the Government has shown beyond a reasonable doubt that Mr. Tarbell cut or damaged the trees and timber in question.

### B. Whether the Harvest Occurred on Land Within the National Forest System or on a National Forest System Road or Trail

For actions under 36 C.F.R. § 261.6(a), federal ownership of the land is an essential element of proof. *United States v. Lopez*, 732 F.2d 127, 128 (10th Cir. 1984). "If such ownership is not present, then not only would the government fail in any attempt to prosecute for trespass on the land, but the district court would not have subject matter jurisdiction of the case." *Id.* The Government must prove its ownership of the land beyond a reasonable doubt. *Id.* at 129.[2]

Although federal law defines the elements of the offense, "federal courts look to state property laws in defining underlying concepts of ownership for the purpose of deciding whether a

---

[2] Mr. Tarbell does not appear to dispute the government's position that violations of 18 U.S.C. § 551 and 36 C.F.R. § 261.6(a) are strict liability crimes and therefore do not require proof that the defendant knew the timber was located on the Green Mountain National Forest.

defendant violated a federal criminal statute aimed at protecting property." *United States v. Taylor*, 867 F.2d 700, 703 n.2 (D.C. Cir. 1989); *see also Exp.-Imp. Bank of U.S. v. Asia Pulp & Paper Co.*, 609 F.3d 111, 117 (2d Cir. 2010) (citation modified) ("In the absence of a superseding federal statute or regulation, state law generally governs the nature of any interests in or rights to property that an entity may have. . . . Drawing upon the well known 'bundle of sticks' analogy to describe property rights, state law determines only what sticks are in a person's bundle; federal law then dictates what may be done with that state-given bundle.").

The parties dispute whether the Government has proven beyond a reasonable doubt that it owns the area of the timber harvest. The Forest Service owns land directly north of Mr. Tarbell's property. The Government and Mr. Tarbell dispute the location of the boundary line between the Forest Service's property to the north and Mr. Tarbell's property to the south. (*See* Exs. 42, C.)

"The 'master rule' of deed construction is that the intent of the parties governs." *LeBlanc v. Snelgrove*, 2015 VT 112, ¶ 30, 200 Vt. 579. In ascertaining intent, the court "must consider the deed as [a] whole and give effect to every part contained therein to arrive at a consistent, harmonious meaning, if possible." *Id.* (citation modified). "In interpreting a deed, a court must first look to the language of the written instrument because it is assumed to declare the intent of the parties." *Davis v. Gabaree*, No. 2009-180, 2010 WL 1266129, at *3 (Vt. Apr. 1, 2010) (citation modified) (unpublished entry order) (quoting *Kipp v. Est. of Chips*, 732 A.2d 127, 129 (Vt. 1999)). "If a deed term is unambiguous, the plain meaning of the language controls without resort to rules of construction or extrinsic evidence." *LeBlanc*, 2015 VT at ¶ 30 (citation modified). "A deed term is ambiguous if reasonable people could differ as to its interpretation." *Id.* at ¶ 31 (citation modified).

Under a quitclaim deed dated August 26, 2004, Mr. Tarbell holds record title to, in relevant part, "Lot 3, Range 8, and Lot 3, Range 9, containing four hundred (400) acres, more or less,

8

[bounded] on the North by Lot 4, Range 8, and Lot 4, Range 9" in Stratton, Vermont (subject to an exception not relevant here). (Exs. D, M, P.) The plain language of the deed is unambiguous that Mr. Tarbell owns Lot 3, Ranges 8 and 9. (*See* Ex. H-1 at 59 (explaining how Stratton proprietors apportioned town land using a numbered grid of east-west ranges and north-south lots, allowing each parcel to be identified by its unique lot/range number, and assigning each parcel to an original grantee).)

Well-established Vermont law provides that a deed's reference to lot numbers established during the original division of property within the town sets the boundaries of the property:

> The Court [in *Spiller v. Scribner*, 36 Vt. 245 (1863)] pointed out that an additional, more particular description [in the deed] could have overridden the reference to specific lot numbers, but that the description of a lot by reference to its number is a description in its legal effect according to the lines of such lot as surveyed and established in the original division of town,[3] and is just as definite, although not so particular, as it would be if the lines were given, and should receive the same construction and have the same legal effect, in one case as the other, and such description in this case must be the controlling description, and determine the extent of the land conveyed.

*Withington v. Derrick*, 572 A.2d 912, 914 (Vt. 1990) (citation modified); *see also Neill v. Ward*, 153 A. 219, 225 (Vt. 1930) (upholding admissibility of town lotting plan and description of lots in field book in action for alleged trespass and timber cutting because "[t]he actual location upon the ground of original lot lines will control, if capable of being ascertained"), *overruled on other grounds by Vt. Structural Steel v. State Dep't of Taxes*, 569 A.2d 1066 (Vt. 1989).

---

[3] Original surveys of the division of property take precedence over new surveys. *See* 9 *Powell on Real Property* § 68.13 (2025) (emphasis in original) (citation modified) ("The surveyor who first maps out a hitherto undivided tract of land is an *original surveyor* who makes an *original survey*. When the landowner conveys out portions of the land relying on the boundaries, monuments, and lines set by the original survey, the rights vested in the grantees bestow on the survey an authenticity that prevents retroactive alteration or correction—those vested rights give the original survey its special status. . . . Surveyors subsequent to the original surveyor are *following* or *tracing* surveyors. They are employed not to lay out new lines on previously uncharted territory, but to locate on the ground previously established lines and monuments. The following or tracing surveyor is not a creator, only a discoverer. . . . When there are inconsistencies between older and newer surveys, the older ones prevail.").

At trial, former Forest Service surveyor Butts testified that the description of a boundary in a legal document constitutes "a set of instructions to a competent surveyor to go out on the land and locate the boundary that the . . . persons that entered into the agreement want them to find." (Doc. 60 at 27:12–16.) Surveyors first examine legal documents—generally but not always including a deed—that may contain a description of the land to determine what the boundary is. (*See id.* at 27:9–24.)

Surveyors then visit the property and use the description to look for "real evidence" of the boundary—material objects called "monuments." (*Id.* at 28:1–9.) A monument is a "physical object that marks, identifies and gives permanence to the corner point"—that is, the "exact place, point, terminus or angle point of a dividing boundary between parcels of property." 1 *Clark on Surveying and Boundaries* § 14.02 (8th ed. 2025). Examples of monuments include iron pipes, blazed trees, rivers, or fences. (Doc. 60 at 28:1–9). If a surveyor can locate original monuments—real evidence of the original boundary—those original monuments define the legal boundary. (*See, e.g.*, Doc. 61 at 223:15–17, 238:17–19; Doc. 62 at 17:18, 18:8–9); *see also* 11 C.J.S. *Boundaries* § 219 (2025) ("The original monument, or in case of its loss its substitute located according to law, is the monument protected by" federal law); 1 *Clark*, § 14.02 ("Courts place major importance on the recovery of evidence relating to the original position of the corner. . . . Under common law and Federal survey law, corners control; and corners are made distinctive by the monuments that are placed to identify them.").

The Government contends that the monuments labelled Corners 16, 17, and 18 correctly identify the locations of original monuments and corners and thus correctly define the northern boundary of Lot 3, Ranges 8 and 9 (Mr. Tarbell's property). (*See, e.g.*, Doc. 64 at 11.) There is no dispute over monumented Corner 51 at the northwest corner of Mr. Tarbell's property or of monumented Corner 15 at the southeast corner of Mr. Tarbell's property. (*Id.* at 10; Exs. 42, C.)

The Government introduced expert testimony and several plats to support its position that Corners 16, 17, and 18 track the original east-west boundaries of Lot 3, Ranges 8 and 9. This evidence includes Mr. Butts's compilation plat (Ex. 1); Ms. Iwanicki's survey plat (Exs. 5, 46); and Mr. Grimaldi's verification of the corners (Doc. 61 at 18:15–22).

However, all of the Government's evidence that the disputed Corners accurately reflect the locations of original monuments ultimately derives from a single source: a January 1921 map with an International Paper stamp on it prepared by an engineer named E. McCourt Macy. (*See* Ex. 2 ("the International Paper" map);[4] *see also* Doc. 60 at 31:13–17; *id.* at 33:6–34:4; *id.* at 34:18–35:9; *id.* at 105:6–12; Doc. 61 at 47:19–48:15.) The record contains no evidence that any surveyor located a monument at Corners 16, 17, or 18 that predates January 1921. (*See, e.g.*, Doc. 61 at 66:11–20 (testimony of Mr. Grimaldi that "obviously we don't know when the monuments were set . . . when those old corners, spruce post and stones, were set because there's no real data on" the International Paper map).) Therefore, whether the Government can show that Corners 16, 17, and 18 are located on the original border of Lot 3, Ranges 8 and 9 directly depends on whether the International Paper map establishes the existence of original monuments in these locations.[5]

The Government contends that the Court can rely on the International Paper map to establish the original locations of Corners 16, 17, and 18. Expert witnesses testified that the International Paper map is a survey plat that designates the east-west land border across the north of Lot 3, Ranges 8 and 9. (*See* Doc. 60 at 32:11–25, 34:13–25; *id.* at 105:6–10.) Mr. Butts further testified

---

[4] At trial, Exhibit 2 was referred to as "the Macy map" or "the 1921 map."

[5] To assist the reader's understanding of the maps referenced in this decision, the Court attaches as Appendix A an illustration that labels in red ink the approximate locations of disputed Corners 16, 17, and 18 on the International Paper map. The International Paper map admitted into evidence as Ex. 2 does not contain these labels. The Court has added these approximate markers for reference only, based on comparison of the International Paper map with additional plats in the record. The illustration located at Appendix A is not an exhibit admitted into evidence and does not constitute a finding of fact regarding the precise locations of the disputed Corners.

that Mr. Macy's "work is known to be accurate and recoverable and has been used by Forest Service surveyors in Vermont for over 40 years," (*id.* at 34:1–4), and that Alfred Tier, the person who Mr. Butts believed performed the field work for the International Paper map, was "a most accurate surveyor" (*id.* at 32:20–25.)

On this record, the Government has not proven beyond a reasonable doubt that Corners 16, 17, and 18 mark the original east-west border across the north of Lot 3, Ranges 8 and 9 and thus that the Forest Service owns the parcel of land at issue. Importantly, no record evidence confirms whether Mr. Macy (or someone working for him in the field) *found* monuments at Corners 16, 17, or 18, or whether he *set* those corners while preparing the map. (*See, e.g.*, *id.* at 218:4–219:2; Doc. 61 at 66:11–20, 221:7–16.) The map itself does not say.[6] *See Chinoweth v. Haskell's Lessee*, 28 U.S. 92, 96–97 (1830) (suggesting that surveyors customarily designate on their surveys any established boundary lines or corners from prior surveys "by naming the person whose line or corner it is" and interpreting the lack of such a description to "rather exclude the idea that [the monuments] were already marked as the corner of a previous survey"). Surveyors may place monuments at corners if none exist there. (*See* Doc. 60 at 50:14–25.) And record evidence is consistent with the possibility that Mr. Macy set the corners identified in the International Paper map. (*See* Ex. 2 (handwritten annotations of several corners of Lot 3, Ranges 8 and 9 reading "spruce post & stones"); Doc. 60 at 53:19–54:3 (testimony that in 1921 a common monument in a wooded area was a spruce post and stones because spruce is more durable than other trees).)

---

[6] At trial, Mr. Grimaldi testified that the corners on the International Paper map with annotations reading "old corner" lead to a presumption that Mr. Macy (or someone performing his field work) most likely found monuments at those corners. (*See, e.g.*, Doc. 62 at 15:16–16:22.) Several corners surrounding Mr. Tarbell's parcel do include the notation "old corner," including Corner 51 in the northwest and Corner 15 in the southeast. However, none of the disputed corners—Corners 16, 17, and 18—contain the notation "old corner." (*See* Doc. 64 at 10 ("There is no dispute about the location of monumented corner 51 at the northwest corner of Defendant's property, nor of monumented corner 15 at the southeast corner of Defendant's property. The dispute focuses on whether monumented corners 16, 17, and 18 represent the boundary line . . . .").) One reasonable interpretation of the International Paper map is that Mr. Macy chose not to label Corners 16, 17, and 18 with "old corner" because he did not find original monuments there.

Without knowing whether Mr. Macy found or set the corners in question, the Court cannot reliably assess whether the corners marked on the International Paper map correspond to the original corners. As discussed above, original monuments control. (*See, e.g.*, Doc. 61 at 223:15–19.) If Mr. Macy set the corners, we do not know how he determined where to set them or what information he relied on to do so. Instead of relying on original monuments, Mr. Macy could have set corners based on prior surveys or other documents not in evidence. (*See* Doc. 61 at 66:21–67:4.) The International Paper map does not have any annotations indicating that old monuments existed near Corners 17 and 18 (unlike other corners), plausibly suggesting that Mr. Macy must have relied in part or in whole on unknown documents absent from the record to identify these corners. It is also unknown whether Mr. Macy relied on any version of the town lotting plan and, if so, which version he used. (Doc. 60 at 219:7–12.) In short, although Mr. Macy may have produced accurate and recoverable surveys, on this record it is unknown whether the information he relied on to create the International Paper map was equally accurate and reliable.

The International Paper map does contain one indication that Mr. Macy or his survey team may have located an original monument near one of the corners at issue. The map contains a handwritten annotation near Corner 16 that reads "post end of stone wall by road." (Ex. 2.) It is unlikely an entire stone wall was built as a monument. Therefore, the description "stone wall" suggests that Mr. Macy or the person performing his field work found the wall rather than setting it. Several witnesses at trial also testified that they recall a stone wall in that area. (*See* Doc. 61 at 179:5–180:10 (testimony of David Van Vleck, Jr. that a stone wall with a post marked the property boundary along Grout Pond Road); *id.* at 193:17–194:2, 201:21–202:7 (testimony of Ralph Staib, retired road foreman for the Town of Stratton, that he recalled a post and a stone wall just past the open field on the right side of Grout Pond Road).) But it is unknown whether Mr. Macy relied on the stone wall to set Corner 16. The International Paper map does not indicate that original

13

monuments existed near Corners 17 and 18, suggesting that Mr. Macy relied in part or in whole on unknown documents absent from the record to identify his corners. Moreover, Mr. Van Vleck and Mr. Staib testified that the stone wall and post were located directly south of the open field and somewhat north of Mr. Tarbell's driveway entrance—that is, somewhat north of Corner 16 (although their estimates of the distance in feet of the stone wall and post from the field and driveway vary). (*Id.* at 180:6–10; *id.* at 200:21–201:11); s*ee Wacker v. Price*, 216 P.2d 707, 711–12 (Ariz. 1950) (citation modified) ("The boundaries fixed by the property owners themselves in the absence of the inability of surveyors to definitely fix the monuments from which the original survey was made must control. . . ."); *Brew v. Nugent*, 117 N.W. 813, 814–15 (Wis. 1908) ("It is the settled law that in controversies as to the proper locations of corners or boundaries of lots or blocks in platted lands the original location of monuments must prevail, regardless of whether the same coincide with the courses and distances laid down on the plat, and that in determining such locations if such monuments have disappeared they must be established by the best evidence the nature of the situation is susceptible of.").

No surveyor has located the stone wall or post to confirm how close they are to Corner 16. The stone wall and post no longer exist, and it is unknown when they were removed. (*See* Doc. 61 at 187:23–189:8; *id.* at 201:12–202:3.) Had the Forest Service surveyed Tract 435 at the time of purchase in 1979, the surveyor might have located the stone wall and had the opportunity to clarify its relationship to the corner marked on the International Paper map. (*See id.* at 187:23–188:8 (testimony of Mr. Van Vleck, Jr. that the post and stone wall were removed at some point after the Forest Service purchased Tract 435).) But the Forest Service did not do a survey at the time of purchase. (Doc. 60 at 105:22–106:11.) The first Forest Service survey in evidence occurred in October 1985. (Exs. 5, 7.) Neither that survey nor any subsequent surveys mention a stone wall or post near Corner 16. The record evidence does not indicate whether any surveyor attempted to

14

ascertain the original location of the stone wall. *Cf. Powell* § 68.13 ("Sometimes a monument placed by an original surveyor is no longer visible, thus rendering the location of a line uncertain. A landmark no longer visible but whose location may be established by competent evidence is an *obliterated* or *unknown* monument. The task of the tracing surveyor is to re-establish the location of an obliterated monument."). Without knowing whether Mr. Macy set the northeast corner at the stone wall, the International Paper map does not establish the location of Corner 16 beyond a reasonable doubt.

The record contains additional evidence that the International Paper map does not establish the Government's asserted boundary beyond a reasonable doubt. For example, the International Paper map's boundaries for Lot 3, Ranges 8 and 9 are not consistent with the lot plans for the Town of Stratton. (*See, e.g.*, Ex. C; Ex. H-1 at 60.) Stratton's proprietors divided the town into lots approximately 200 acres in size (one half-mile by one half-mile). (Ex. H-1 at 59; *see also* Exs. D, M, P (describing Lot 3, Ranges 8 and 9 as approximately 400 acres).) As surveyor DiBernardo testified, however, the International Paper map indicates boundaries for Lot 3, Ranges 8 and 9 that result in a smaller acreage than called for by the original lotting plan:

> [T]he intent in Otto's deed was to buy Lot 3/Range 8, Lot 3/Range 9. Based on *The History of Stratton*, those lots are to be half mile by half mile, which is 2,640 feet, or 160 rods, and if you—if you look at the Macy plan, the east boundary of Lot 3/Range 8 is 144 rods, 20 links, which is about 15 rods, 80 links short of what the line was supposed to be.

(Doc. 61 at 223:9–19.)[7]

The Government contends that the original lot sizes are consistent with its asserted boundary because it is not possible to create lots that are precisely one half-mile by one half-mile. (*See* Doc. 62

---

[7] The Government notes that testimony at trial indicated that lotting plans "are merely relational depictions of the lots and are not boundaries" because lotting plans are not survey plats of original surveys. (Doc. 64 at 18.) But Mr. DiBernardo did not testify that the lotting plan established a boundary. As the Government notes, he did not conclude on a boundary at all. (*Id.*) Rather, Mr. DiBernardo testified that the boundary on the International Paper map did not comport with the size of the lots called for in the town lotting plan.

at 17:2–18.) Thus, the Government urges the Court to rely on the original monuments as identified on the International Paper map. (*Id.*) Original monuments do control. As discussed above, however, the Government did not establish that the corners identified by Mr. Macy track the locations of original monuments. (*See* Doc. 61 at 223:15–22.) Those corners do not decisively rule out evidence that, based on the original division of lots, Mr. Tarbell's property may be larger than the Government asserts. *Cf. Withington*, 572 A.2d at 914.

Several additional unknowns cast doubt on the International Paper map. Simply put, there are significant questions about the International Paper map that the record evidence does not conclusively answer. For example, it is unknown whether Mr. Macy was tasked with surveying Lot 3, Ranges 8 and 9—record evidence suggests that Mr. Macy only surveyed several abutting lots owned by International Paper. (*See* Doc. 62 at 29:21–25.) Additionally, the record contains another version of the International Paper map, also dated January 1921, but this second version omits certain details regarding the contested boundary that the International Paper map includes. *Compare* Ex. 2 *with* Ex. E-1. It is not known why two versions of the map exist or why the two maps contain slight differences. One explanation is that one or both versions were intended to be reproductions because copiers did not exist when the maps were created. (*See* Doc. 62 at 29:1–20.) But Mr. Macy did not sign or record either map. *Cf. Kidder v. Kennedy*, 43 Vt. 717, 728–29 (1871) (treating survey of a lot and the recording of the survey as evidence of claim of title for purposes of a timber trespass action). It is also unknown why Mr. Macy did not sign or record either map or why he chose to omit several notations along the contested boundary line on one, but not both, maps.

The Government contends that several facts weigh in favor of the Forest Service's ownership of the disputed parcel: that the International Paper map was hanging on the wall of the Stratton Town Office when Mr. Tarbell purchased his property in 2004; that the 1991 and 1994 survey plats were publicly available in the town office at the time of purchase; that Mr. Tarbell

16

submitted a Forest Management Plan map consistent with the Government's asserted boundary to apply for enrollment in the Vermont Continued Use program in August 2005; and that Mr. Tarbell's application for a driveway permit attached a hand-drawn sketch identifying "a land corner pin located 23 feet from the center of the Road, just where the 1921, 1979, and 1991 plats, and Defendant's [Forest Management Plan] map show corner 16 to be located." (*See* Doc. 64 at 13–14.) The Government also notes that the Town of Stratton tax map lists Mr. Tarbell's property as encompassing a total acreage of 387 acres. (*Id.* at 13.)

But Mr. Tarbell's deed does not reference either of Mr. Macy's maps, the Forest Management Plan map, the tax map, the driveway permit sketch, or any survey. (Exs. D, M, P.) Although maps referred to in a conveying document "are regarded as incorporated into the instrument and given considerable weight in determining the true description of the land," the Court is unaware of any case in which a map not referred to in the deed had authority over the description in the deed. *See Withington*, 572 A.2d at 914 (citation modified); *see also William R. Sawyer-Overlake II, LLC v. Jones*, No. 2015-209, 2015 WL 6395288, at *4 (Vt. Oct. 21, 2015) (unpublished entry order) ("To the extent that plaintiff relies on maps prepared or approved in connection with various government permits, those maps cannot alter the private property rights of the parties in question."); *Arthur v. Lake Tansi Vill., Inc.*, 590 S.W.2d 923, 929 (Tenn. 1979) (citation modified) ("Obviously a plat to which no reference is made cannot be incorporated in a deed."); *Marshall v. Soffer*, 756 A.2d 284, 288 (Conn. App. Ct. 2000) ("There is no notice of the contents of a map except if the terms of a recorded deed refer to the map."). Mr. Tarbell's deed conveys Lot 3, Ranges 8 and 9. None of the above maps establish those boundaries.

The Government's remaining arguments are not persuasive. The Government notes that the proprietors of Stratton met in 1781 to discuss the "problem" that the first three ranges "contained only 160 acres, not the 200 acres" originally intended. (Doc. 64 at 19.) Other lots within the town

explicitly departed from the half-mile by half-mile size (500 acres, 40 acres, 100 acres). (*Id.*; *see also* Ex. H-1 at 59.) But by the plain language of his deed, Mr. Tarbell's property encompasses approximately 400 acres total. (Exs. D, M, P.) Moreover, the "problem" addressed at the 1781 Proprietors' Meeting that "lots within the first three ranges each contained only 160 acres, instead of the intended 200 acres" could reasonably be interpreted to demonstrate that the proprietors intended to keep the lots as close to the intended acreage—200 acres—as possible, casting doubt on the Government's asserted boundary. (Ex. H-1; *see also* Doc. 61 at 223:9–19 (testimony that the boundary identified in the International Paper map would result in a smaller acreage than two 200-acre parcels).)

The Court need not determine whether the "un-monumented line the Defendant has described is the boundary line." (*See* Doc. 64 at 10.) The Government—not Mr. Tarbell—has the burden to prove all elements of its case beyond a reasonable doubt. On this record, the Government has not proven beyond a reasonable doubt that the Forest Service owns the area of the timber harvest.[8]

## II.   Counts II and III: Willfully defacing, changing, or removing monuments of a Government survey

Under 18 U.S.C. § 1858, "[w]hoever willfully destroys, defaces, changes, or removes to another place any section corner, quarter-section corner, or meander post, on any Government line of survey, or . . .  willfully defaces, changes, or removes any monument or bench mark of any government survey" is subject to a term of imprisonment, a fine, or both.

The central dispute concerns whether the term "willfully" requires the Government to prove that the defendant knew a monument was located on federal land before he may be criminally liable

---

[8] Notwithstanding the Court's conclusion in this criminal case that the Government has not proved its ownership of the disputed parcel beyond a reasonable doubt, the Court makes no finding as to whether the Forest Service or Mr. Tarbell owns the disputed land.

under the statute. The Government contends that the law does not require "that the monument that is willfully removed be located on government land." (Doc. 64 at 23.) Mr. Tarbell asserts that "the survey markers alleged to have been removed by him were not clearly shown to be on Forest Service lands and therefore he couldn't have the requisite mental intent to remove government survey markers." (Doc. 63 at 33.)

The Court is unaware of any binding precedent examining the knowledge requirement under § 1858. *United States v. Allen*, 788 F.3d 61, 69 n.4 (2d Cir. 2015) (acknowledging that § 1858 employs a scienter of "willfulness," but noting that "[n]o case has addressed the federal knowledge requirement for this section"). In deciding this question, the Court must "look to the language of the statute, the intent of Congress as expressed in the legislative history, and cases involving the interpretation of this and similar statutes." *See id.* at 66 (citation modified). "The record is silent as to Congress's precise intent in" enacting § 1858. *See id.* at 67 (citation modified). "In light of the lack of direct judicial authority on willfulness" in § 1858 "and the paucity of legislative history," the Court "turn[s] for guidance to cases that have discussed the federal knowledge requirement with respect to similar statutes." *Id.* at 68.

*Allen* provides the relevant analytical framework for determining whether, for purposes of § 1858 and its sister statutes, "federal title to the land is merely a jurisdictional prerequisite" or whether knowledge of federal title is an element of the substantive offense. *See id.* at 68; *see also id.* at 69, n.4 (describing §§ 1851–64 as "sister statutes"). When statutes criminalize conduct that is "otherwise innocent," "the Supreme Court has read [those] criminal statutes to include broadly applicable scienter requirements, even where the statute by its terms does not contain them . . . ." *Id.* at 69 (citation modified). When prohibited conduct significantly overlaps with "a broad range of apparently innocent conduct," federal courts require knowledge of the specific element that makes the conduct criminal. *See United States v. LaPorta*, 46 F.3d 152, 158 (2d Cir. 1994). In

19

*LaPorta*, the court interpreted 18 U.S.C. § 1361—prohibiting "willful injury or depredation against federal property"—as not requiring the government to prove that the defendant "knew the government owned the property in question." *Id*.

*LaPorta* contrasted its interpretation of § 1361 with other statutes that require knowledge of the specific element rendering the conduct criminal. For example, "to be convicted under 18 U.S.C. § 2252, a defendant must know he is trafficking in pornography *involving children* because non-obscene, sexually explicit materials involving persons over the age of 17 are protected by the First Amendment." *Id.* (citation modified)(emphasis added). Similarly, the Supreme Court found "a scienter requirement in a statute prohibiting the use of food stamps in any manner not authorized by the statute, since to hold otherwise would 'criminalize a broad range of apparently innocent conduct.'" *Id.* (quoting *Liparota v. United States*, 471 U.S. 419, 426 (1985)). In other words, the Supreme Court has implied a heightened intent requirement to elements of federal criminal statutes that were "not [] mere jurisdictional elements, but [were] the very element[s] that made the conduct dangerous or criminal." *Allen*, 788 F.3d at 69.

Because § 1855 criminalized setting timber on fire on federal lands, and because "arson is hardly otherwise innocent conduct," *Allen* concluded that the "willfulness" language in § 1855 "does not require knowledge that the lands are federal." *Id.* (citation modified). However, *Allen* also observed that, while "no case has addressed the federal knowledge requirement" for § 1858, "the language in § 1855 accords more squarely with the statute in *LaPorta* than with § 1858." *Id.* n.4 (citation modified). In other words, the Second Circuit left open the possibility that, although § 1855 does not require knowledge that the lands are federal, the same "willfulness" standard in § 1858 could require that showing.

In contrast with *Allen* and *LaPorta*, the removal or defacement of boundary markers in a property line dispute between adjacent landowners has no comparable "settled expectations" of

20

unlawfulness. *See LaPorta*, 46 F.3d at 158–59 (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 71 (1994)) (finding that arson is not otherwise innocent conduct because "[n]o one harbors settled expectations that he is free to burn the property of others"). Unlike arson, "[a]t common law there was no criminal liability for removing a landmark . . . ." 11 C.J.S. *Boundaries* § 219 (2025) (citation modified); *see also Allen*, 788 F.3d at 67. Moreover, as one treatise observes, "[r]esort to criminal prosecutions in disputed boundary cases is not favored and good faith differences as to boundaries are not proper subjects for criminal prosecution." 11 C.J.S. *Boundaries* § 219. Similarly, several courts have found that good faith differences over boundaries are not proper subjects for criminal prosecution. *United States v. Miller*, 659 F.2d 1029, 1030 (10th Cir. 1981) (citation modified) ("Criminal process should not be used for the purposes of settling a land dispute, and upon that basis we reverse the conviction and remand the cause with directions to dismiss the criminal charge."); *Stockman v. State*, 826 S.W.2d 627, 635 (Tex. App. 1992) ("Criminal courts are not the forum for determination of disputed titles to real estate, and a criminal prosecution is not the medium for making such determination.").[9]

The wide variation among the States in their approaches to removal of boundary markers in property disputes further demonstrates the absence of "settled expectations" as to criminal liability. For example, some states impose only civil—not criminal—liability for removal of boundary markers. *See, e.g.*, N.Y. Educ. Law § 7209(9)(a) (damaging or destroying a boundary marker on a

---

[9] By referencing these observations in the case law and secondary sources, the Court does not question the good faith initiation of criminal proceedings in this case. At trial the government introduced evidence to show that its asserted boundaries were consistent with a century of survey, plat, and other documentary evidence, and therefore the timber harvest was a willful violation of its property rights in the Green Mountain National Forest. In finding that Mr. Tarbell has raised reasonable doubt as to those boundaries, notwithstanding the historical evidence the government presented, the Court has considered the relevant property law principles and examined a variety of countervailing historical evidence, including the deed, the Macy map, the second and slightly different version of the Macy map, testimony of witnesses familiar with the disputed area, and the Town of Stratton's lotting plan. The robust evidentiary record in this case—containing evidence supportive of each party's respective position—necessarily results in acquittal in the criminal prosecution. However, the evidence developed at trial would be highly relevant in a civil action to resolve the ownership dispute.

tract of land "in which [the person] has no legal interest" shall result in a "civil fine" of not more than five hundred dollars and the "cost of reestablishment of [the] boundary marker"); Or. Rev. Stat. §§ 209.150, 209.990 (2023) (obligating a person removing, disturbing, or destroying a survey monument to pay the costs of referencing and replacing the survey monument). In states imposing criminal liability for removal of boundary markers, the intent required for a conviction falls along a wide spectrum. Some states require a showing of malice. *See, e.g.*, Cal. Penal Code § 605; Idaho Code Ann. § 18-7016 (West 2025); *see also* Black's Law Dictionary 1100 (10th ed. 2014) (defining "malice" in relevant part as "the intent, without justification or excuse, to commit a wrongful act" or "reckless disregard of the law or of a person's legal rights"). Another state imposes criminal liability for "tampering with a landmark" with "the intent to fraudulently alter a boundary"). *See* Kan. Stat. Ann. § 21-5816 (West 2025). Colorado criminalizes removal of boundary markers "knowingly." Colo. Rev. Stat. § 18-4-508 (West 2025). Kentucky imposes a more severe penalty for "fraudulent and willful" removal than for removal "willfully and knowingly, but without a felonious intent." *See* Ky. Rev. Stat. § 433.770 (West 2025) (establishing Class D felony and payment of cost of reestablishment for the former and payment of cost of reestablishment only for the latter). Similar to the federal statute, Arkansas requires a showing of willfulness. *See* Ark. Code Ann. § 5-38-214 (West 2025). And certain states only criminalize removal of specific types of boundary markers. *See, e.g.*, Ariz. Rev. Stat. § 33-103 (2025) (only landmarks used to mark official surveys, not all boundary markers); Ga. Code Ann. § 44-1-15 (West 2025) (geodetic control markers and property corner monuments made part of real property documents filed in the office of the clerk of the superior court); La. Rev. Stat. Ann. § 50:64 (2025) (providing for a fine and civil action for damages in willful defacement or removal of U.S.-owned survey markers).

In short, the split in the various jurisdictions between civil and criminal penalties, the prevalence of malicious or fraudulent intent requirements, and the absence of a consistent standard

22

for intent collectively suggest no "settled expectations" that removal of boundary markers in a circumstance involving an apparently good faith property dispute is inherently wrongful.

Because removing a boundary marker in a good faith property dispute does not implicate "settled expectations" of criminality, § 1858 must be interpreted to criminalize conduct that is "otherwise innocent."[10] *See LaPorta*, 46 F.3d at 158–59. Therefore, the Court concludes that § 1858 requires the Government to prove knowledge of the specific element that makes the conduct criminal—in this case, knowledge that the lands are federally owned. *See id.* at 158; *Allen*, 788 F.3d at 66, 69 (holding that consideration of whether the word "willfully" includes defendant's knowledge that the land is federal depends on whether statute criminalizes otherwise innocent conduct).

The evidence does not show beyond a reasonable doubt that Mr. Tarbell willfully violated 18 U.S.C. § 1858; that is, that he defaced or removed a monument with knowledge that it was on federal land. The evidence introduced at trial demonstrated that the parcel of land was the subject of a sharply contested ownership dispute. The statements attributed to Mr. Tarbell clearly evidence his unwillingness to acquiesce in the placement of boundary markers on the disputed land until actual ownership was settled between the parties or by a court. (*See, e.g.*, Ex. 17f at 0:01–0:16 ("I cannot

---

[10]  The Government contends that removal of a government survey marker "does not present the situation where otherwise legitimate conduct becomes unlawful solely because of the identity of the individual, agency, or government that is the victim," asserting that under Vermont law interference "with any survey monument is considered a criminal offense" under 13 V.S.A. § 3834. (Doc. 64 at 24) (citation modified). The plain text of the statute, however, provides that the *knowing* defacement or removal of a survey monument may result in a $100 fine and civil liability for replacement costs and consequential damages. Further, as far as the Court is aware, the Vermont Supreme Court has not explained what is required to demonstrate "knowing" violation of the statute. The mens rea of "knowingly," for example, may be interpreted to require proof of bad faith.

Additionally, although § 3834 is found in Title 13 of the Vermont Statutes ("Crimes and Criminal Procedure"), Vermont courts appear to treat causes of action under the statute as civil in nature. *See, e.g.*, *Shahi v. Madden,* 2008 VT 25, 183 Vt. 320, 325 (awarding plaintiffs $1,000 on § 3834 claim for unlawful removal of survey stakes); *Evans v. Cote*, 2014 WL 104, 197 Vt. 523, 527 (noting that plaintiff property owner brought claim for "a penalty and costs for removal of survey monuments" under § 3834); *cf. Wei Wang v. Shen Jianming*, Case No. 2:17-cv-00153, 2019 WL 3254613, at *7 (D. Vt. July 19, 2019) ("A private plaintiff generally cannot assert a claim based on a violation of a criminal statute.").

let the, the pin stay there because it's, because that's you telling the court that I conceded the day that you came and I'm not, I can't do that because that's where we're going to end up. So, we don't need a pin until we go to court and figure this out or until we get together and figure it out together."); Ex. 17h 0:00–0:12 ("He's gonna take it out or I'm gonna. I'm just saying that we're not going to do that until we're done because that's not the line and I'm not conceding to it."); Ex. 17i 0:00–0:27 ("That's my land. It's my fucking land and I don't need anything from you to decide what's going on with my land. I'm putting that, whether he writes me out a ticket or he—or he doesn't write it. Write a ticket out if you need to. That's where we'll start. I'm, I'm done. We, we need to go to court over it if that's what we need to do. I'm not gonna hee-haw and go back and forth and things get lost and all this other shit. We, we need to figure it out for all of us.").)

After careful consideration of all the evidence presented, the Court cannot conclude beyond a reasonable doubt that Mr. Tarbell defaced or removed markers with knowledge that they were on federal land. Therefore, the Court finds that the Government did not prove beyond a reasonable doubt that Defendant Raymond Otto Tarbell willfully defaced, changed, or removed a monument or bench mark of a Government survey in violation of 18 U.S.C. § 1858.

## **Conclusion**

The Court finds Raymond Otto Tarbell NOT GUILTY of Counts I, II, and III of the Amended Information. This opinion shall constitute findings of fact and conclusions of law under Fed. R. Crim. P. 23(c).

Dated at Burlington, in the District of Vermont, this 8th day of May 2026.

/s/ Kevin J. Doyle
Kevin J. Doyle
United States Magistrate Judge

24